UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                     Case No. 1:22-CR-29

                                                        Hon. Robert J. Jonker

BRENDON GAGNE,

    Defendant.
_____

### DEFENDANT BRENDON GAGNE'S SENTENCING BRIEF

Defendant Brendon Gagne's sentencing hearing is August 29, 2023. The defense respectfully argues that the Government's Sentencing Guideline range is grossly overstated at 87 to 108 months.

In February 2023, Mr. Gagne pleaded guilty without a plea agreement to conspiracy to smuggle goods into the United States, in violation of 18 U.S.C. §§ 371 and 545, and conspiracy to launder money, in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(1)(A)(i). The PSR writer concluded that the Guideline range is 87 to 108 months, after calculating an Offense Level of 29 with CHC I. The defense disputes this Offense Level and resulting Guideline range in multiple respects.

### SENTENCING CONSIDERATIONS

I. History and Characteristics

Brendon Gagne is 27 years old and a resident of Colorado Springs. He is in a

long-term relationship with a girlfriend and has no children. (PSR ¶ 338, PageID.1563.) He has a close relationship with his mother, but no relationship with either his natural father or a past stepfather who was abusive. He also enjoys a relationship with four of his five siblings, and likes to engage in active, outdoor hobbies. He enjoys bodybuilding and previously used steroids as part of this hobby, which is also how he became involved in the instant offense.

Mr. Gagne graduated from high school in 2013. (PSR ¶ 346 PageID.1565.) He has never attended college or a trade school. Since the commission of the offense, Mr. Gagne devoted himself to learning the real estate business and becoming a licensed realtor. He is proud of how hard he has worked to establish himself in that industry and earn a living the right way. Because that industry operates on a commission-only basis, Mr. Gagne's success depends on establishing a client base and working to help clients buy and sell as many homes as possible. The income is not regular yet, but Mr. Gagne provided information on his commissions (out of which some of his costs must also be paid) to help give an idea of his rough annual income since he started.

## II.  Need to Protect the Public

Mr. Gagne has no history of violence, and the remainder of his minimal criminal history can best be described as minor substance use-related offenses. Mr. Gagne does not pose a significant risk of harm to the public. He has demonstrated greater maturity since his commission of the offense by trying to plan for a future where he can support himself doing something he enjoys, in a legal manner. He has

recognized that he cannot take shortcuts to get ahead, and he is committed to improving himself.

### III. Nature and Circumstances of the Offense

At its essence, this case is a smuggling case, where Mr. Gagne joined with other unknown co-conspirators, most likely overseas individuals beyond the Government's domestic reach, to import foreign prescription drugs that had not been lawfully imported into the United States. He was involved in September 2018 when websites were first created, until around October 2021. The purpose was to sell those prescriptions at a profit while providing them at a much lower consumer cost because they skipped the domestic importation process. Mr. Gagne also admits that he recruited and managed multiple other people, mostly in the online bodybuilding community, to participate by helping receive packages and break down pills into smaller amounts to send to consumers.

Mr. Gagne also pleaded guilty to the second count in this case, which was money laundering. The evidence demonstrates that other co-conspirators engaged Co-Defendant Funaro's services to process and launder money through cash app and credit card processing sites, and return it to conspirators in cryptocurrency. Mr. Gagne used Mr. Funaro's services for these purposes, to the extent that he is guilty of the charge, but he was not centrally involved in how the process worked and he did not work with or know Mr. Funaro personally.

The Guidelines are not well-equipped to help evaluate Mr. Gagne's offenses for sentencing purposes. They use a "loss" concept although that does not fit here like it

3

would in a consumer fraud or other theft case. The defense believes that the Government will not be able to offer evidence that any consumer was misled or defrauded, i.e., they all ordered otherwise lawful prescription drugs and received what they paid for. So a loss guideline which bakes in offense levels for amounts of harm to individuals based on the size of "loss" already overstates culpability.

Moreover, Mr. Gagne disputes the addition of 16 offense levels for an alleged loss between $1.5 million and $3.5 million. Respectfully, the PSR's numbers are inadequately proven and, in some cases, double-counted. Mr. Gagne does not believe that the Government will be able to demonstrate by a preponderance of the evidence at the sentencing hearing that – even assuming a "loss" concept worked here – that the final number is $1.5 to 3.5 million.

## ARGUMENT

### I. Mr. Gagne disputes both the concept of "loss" here in adding offense levels, as well as the amount. The Government cannot support the addition of 16 offense levels for an alleged loss between $1.5 million and $3.5 million.

The PSR reaches this loss category with a few combined attempts at measure. (PSR § 112, PageID.1529.)

First, an estimate of package value: $1,365.18 x 35 packages = $ 47,781.30

Second, the laundered (through cash apps) money amount that the Government estimated and Mr. Funaro accepted as part of his plea: $1,394,645.50. Mr. Gagne suggests that Mr. Funaro was an experienced money launderer, and there is evidence that his accounts were used for laundering for multiple clients, and

that there is not a reliable way to know how much of this amount is attributed to the instant conspiracy as a whole, and for which part Mr. Gagne would fairly be held accountable.

Third, the Government and PSR assume $1,925,932.12 in cryptocurrency transfers by using a method that they did not document, and by extrapolating 20 months of activity by using the greatest known month in September 2021. This will be insufficiently reliable at the sentencing hearing to credit this number.

Finally, some of the cash app timeframe covers the same timeline as does the cryptocurrency period, and it is likely that some of this was double-counted. The defense leaves the Government to its proofs at the sentencing hearing.

## II. Mr. Gagne disputes that "sophisticated laundering" was used.

Section 2S1.1(b), which adds two levels for "sophisticated laundering," does not apply to Mr. Gagne. Mr. Gagne agrees that sophisticated means is defined in the USSG as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." There was nothing "especially complex or especially intricate" about the laundering here which exhibited any level of sophistication other than that necessary to accomplish laundering in the first place under the statute. No one ran another business as part of the scheme to "wash" the money through it. No one used false names or dummy accounts – they were in Mr. Funaro's name. There was no pyramid scheme transferring money between businesses. There were no fictitious entities, corporate shells, or offshore accounts. Mr. Funaro was essentially a credit card processor who returned the proceeds in

cryptocurrency. It was not a particularly hidden way to process the money; it was just enough to even constitute money laundering in the first place.

### III.   Mr. Gagne disputes that four additional levels for role in offense are appropriate.

Mr. Gagne concedes that he receives additional offense levels under Section 3B1.1, but he disputes a finding that he was an "organizer or leader" who should receive four additional levels. He argues that his involvement in the conspiracy was closer to "manager or supervisor" with a three-level increase. Factors the court should consider when weighing organizer/leader vs. manager/supervisor include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. Section 3B1.1, Comm. ¶ 4.

Mr. Gagne did not have higher-level authority, but instead managed those receiving packages and breaking those down. He did not design the original scheme, and he did not receive a larger share of fruits, but instead more like commission proceeds. Three points is more appropriate than four for his role in the offense.

## CONCLUSION

Mr. Gagne respectfully requests a sentence below the eventual Guideline range, which is sufficient to serve the purposes of sentencing. Using loss as a proxy for culpability is not sufficient in the instant case, since no individuals "lost"

anything. It is a crime which needs to be deterred, but not at the draconian level sought by the Government. The level of 87-108 months is much longer than is necessary or just to accomplish the purposes of sentencing.

Dated: August 15, 2023

Pinsky Smith, PC
Attorneys for Defendant Brendon Gagne

By: /s/ Sarah R. Howard
Sarah Riley Howard
146 Monroe Center St NW, Suite 418
Grand Rapids, MI 49503
(616) 451-8496
showard@pinskysmith.com