UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                          Case No. 1:22-CR-29

                                            Hon. Robert J. Jonker

BRENDON GAGNE,

    Defendant.
_____

### DEFENDANT BRENDON GAGNE'S RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM

The Government asserts that Guideline § 2B1.1 is appropriately applied and that there is "loss" from Mr. Gagne's conduct, as that term is generally used when referring to fraud or theft. The Government also alleges that Mr. Gagne agrees that this is the correct application. (Gov't Br. at 7.) Respectfully, this is incorrect on both accounts, and the defense has been clear that § 2B1.1 overstates the conduct since there was no fraud, theft or loss to individuals. "Loss" itself is not an ambiguous concept from this perspective, and the Application Note to § 2B1.1 cannot be used to build upon a definition when the plain language of the actual Guideline is unambiguous. See *United States v. Riccardi*, 989 F.3d 476 (6th Cir. 2021) (holding that, even if "loss" were ambiguous, the special rule in note 3(F)(i) to §2B1.1, that loss for access devices is $500 per access device, does not fall within the "zone of

ambiguity" in this guideline); see also *United States v. Bays*, 765 Fed. Appx. 945, 952-53 (5th Cir. 2019) (reversing § 2B1.1 loss application where no "loss" caused by defendant's conduct, at least by sales to customers). Although the Sixth Circuit recently held in a different context (theft of trade secrets) that the meaning of "loss" is ambiguous and has no single definition, see Gov't Br. at 8 n.4, calling the results of Mr. Gagne's conduct "loss" on this fact record is a stretch too far. Cf. *United States v. You*, 74 F.4th 378, 397 (6th Cir. 2023) (measuring intended loss for value of stolen trade secrets which were recovered prior to sale).

Moreover, the Government's assertion that the customers here believed that the drugs were FDA-regulated products, and that therefore somehow consumers were deceived in that regard, is not supported by the evidence. The Court's position that something must be used to scale relative culpability is understandable, but it still does not mean that this situation can be fairly shoehorned into § 2B1.1 simply because nothing else fits better.

Perhaps the amount of relative culpability – since § 2B1.1 is the Court's choice for the measuring stick – should be scaled at the total of all 161 packages the Government says it has tracked for Mr. Gagne times $1,365, or $219,765, without further resort to estimated amounts of money that customers paid for product or gross funds laundered. Those amounts are only forms of double-counting in terms of the scaling of culpability of conduct, assuming that the amounts themselves are reliable, which the defense asserts they are not. A "loss" figure based on value of all the packages would result in 10 additional offense levels, more than that attributed

2

to anyone else sentenced from this conspiracy. In any event, using every gross dollar that went through this conspiracy in any form – assuming the Government's calculations and extrapolations are sufficiently reliable – to scale Mr. Gagne's culpability cannot be possibly be the answer.

In terms of the money laundering charge, there is no evidence that Gagne "designed" the payment processing system used to accept customer payments in traditional cash app or credit cards, and then convert them to cryptocurrency. (Gov't Br. at 1.) Indeed, Mr. Gagne has disputed this, and there is no other independent evidence that Mr. Gagne did anything with respect to the money laundering charge except agree to using the services of Mr. Funaro.

Finally, the Government paints an inaccurate picture of Mr. Gagne in its memorandum. He obtained a realtor license after this offense was completed. He had the advantages of a good mother and almost entirely good relationships with his siblings, but he still had a variety of challenges like many defendants do, as were described in the PSR. (See attached support letters for Mr. Gagne.) The Government's implication that Mr. Gagne was an established realtor who was raised with every possible advantage, and then got involved with overseas conspirators in order to just get richer, is not an accurate depiction.

It is true that Mr. Gagne broke the law, and that he led others into doing so with him. He understands that he will be punished for that. But deterring others

who might consider the type of conduct here does not require an 87- to 108-month prison sentence. That would be wholly excessive.

Accordingly, for the reasons stated here and in Mr. Gagne's original sentencing brief, Mr. Gagne asserts that his Guideline range should be below that assessed in the PSR, and that a downward variance is also appropriate to achieve the 3553(a) factors in sentencing.

Dated: August 22, 2023

                              Pinsky Smith, PC
                              Attorneys for Defendant Brendon Gagne

                              By:   /s/ Sarah R. Howard
                                       Sarah Riley Howard
                                       146 Monroe Center St NW, Suite 418
                                       Grand Rapids, MI 49503
                                       (616) 451-8496
                                       showard@pinskysmith.com